UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                                          NO. 09-177

DALTON  BENNETT                                      SECTION "N"

## ORDER AND REASONS

Before the Court is Dalton Bennett's motion for post-conviction relief pursuant to 28

U.S.C. § 2255 (Rec. Doc. 332, as supplemented by 341).  Upon review of the entire record, the

Court has determined that this matter can be disposed of without an evidentiary hearing.  For the

following reasons, the Court DENIES the motion.

## I.      BACKGROUND:

The factual and procedural background of this case were set forth in detail by the Fifth

Circuit in its opinion on direct appeal:

A. Factual Background

Around 11:30 p.m. on February 19, 2008, New Orleans Police Department
("NOPD") Officers Chad Perez and Dean Moore were told by a confidential
informant that defendant Dalton Bennett ("Dalton") had stowed crack inside the
dashboard of a blue Nissan Titan truck parked at the corner of South Johnson and
First Streets in New Orleans, Louisiana.  Perez and Moore knew from previous
investigations that Dalton had prior arrests for narcotics and guns, and that Dalton's
mother lived on that corner.  Perez and Moore approached the corner in their marked
police car and observed two people exiting from Dalton's mother's house.  Perez and
Moore recognized one of them as Dalton, who carried a suitcase to the truck and got
into the driver's seat.  The other person—later identified as defendant Danquell
Miller—got into the passenger's seat.

Dalton and Miller drove off from the corner, followed by Perez and Moore. Dalton exceeded the posted speed limit and failed to signal a turn, so Perez and Moore attempted to pull over the truck. The truck did not stop immediately, and Perez observed Dalton and Miller moving around inside the truck. After the truck eventually stopped, Perez and Moore asked Dalton and Miller to get out of the truck, and the officers noticed the pungent odor of lemon air freshener. Perez and Moore requested a K–9 unit, and NOPD Officer George Chenevert arrived about ten minutes later with Thomas, his drug dog. Chenevert sought permission from Dalton to search the truck, which Dalton gave him.

Thomas immediately reacted to a smell in the truck and went straight for the dashboard. Chenevert removed a panel on the dashboard to reveal a compartment that he knew existed in similar trucks. In that compartment he found a .40 caliber handgun and a clear plastic bag containing what turned out to be crack. Dalton and Miller were detained after the crack and handgun were found. A further search of the truck turned up a Hertz rental-car agreement in the name of Nicole Williams. Dalton identified Williams as his girlfriend. The police arrested Dalton, at which point they found $2,419 in his pockets.

Perez, Moore, Chenevert, Dalton, and Miller traveled to the apartment Dalton shared with Williams, who consented in writing to a search of the apartment. The only fruit of that search was an additional $1,000 discovered in Williams's purse, which she said belonged to Dalton. Miller was released outside Williams's apartment.

Dalton was processed and held at Orleans Parish Prison. While he was intermittently imprisoned from February 20, 2008 through June 21, 2009, Dalton placed over 100 phone calls, and each was recorded. Twenty-eight of those phone calls gave rise to the charges Defendants faced in this case, and were played at trial. In one of the first calls, Dalton explained to Williams that he needed his brother, Lance Bennett ("Lance"), to "take this charge." Dalton told Williams that Lance needed to sign an affidavit stating that he had paid Williams to borrow the truck for a couple of days, that the handgun and crack were his, and that Dalton was just bringing the truck back to Williams and dropping Miller off when the police stopped the truck. Dalton then asked Williams to call Miller, so Miller could look up the number of Dalton's lawyer, Jason Williams ("Jason"). Minutes after that call, Dalton called Williams back to talk to Lance, who had just arrived at Williams's house. Dalton asked Lance to "take this charge," explaining that Lance was "gonna get nothin' but provation [sic]," and that he would pay Lance's legal fees and bond. Lance responded "I'm a do it." Dalton then explained to Lance the story he had created about Lance borrowing the

truck from Williams and instructed him to "go down there with Jason Williams and try to take this ... before the feds accept it."

A few hours later, Dalton called Williams and Williams explained that Miller "gotta let Lance know what to say and all" to Jason. Williams said that Miller already "had to go sit down by your Mama house and talk to Lance." Dalton responded: "[T]hat's good he coachin' him." In a later call that same day, Dalton told Williams that it was important for Lance and Miller to hurry up and find Jason "so he can get this affidavit" signed before the case "go federal." Williams then initiated a three-way call with Miller and Dalton. Dalton told Miller to "make sure y'all try to collect Jason Williams bro, cause I need him to sign that affidavit ASAP right now!" Dalton told Miller to make sure that Lance knew "[w]hat color the thing was" and "how many grams": "Twenty-eight grams, eight grams and that black and silver thing."

Sometime between February 24, 2008, and March 19, 2008, Williams, Miller, Lance and Shelley Knockum (Lance's girlfriend) met with Jason, and Lance executed the false affidavit. The affidavit was signed by Jason and his secretary as witnesses, but Jason never had the affidavit notarized because he suspected the District Attorney's Office would not accept it.

A number of the phone calls played at trial concerned Dalton's attempts to continue to sell drugs both inside and outside Orleans Parish Prison. For example, Dalton called Williams and asked her to tell Miller that he had found a way to get marijuana into the jail, along with some pills. Dalton also spoke directly to Miller about getting an ounce of marijuana and some pills into the jail. Dalton also told Miller to work up to a "four spot" of crack—according to Williams, a bit more than four ounces—by the time Dalton got out of jail, and to get a job so the "alphabet boys" (federal agents) "wouldn't be as hot on him."

At the time Dalton was arrested, he was still on parole for two state charges. Dalton confessed to violating the conditions of his parole, and served a sentence for that violation until March 27, 2009, when he was released from jail. On June 18, 2009, a federal grand jury indicted Dalton for his possession of the handgun and crack; he was arrested on a federal warrant on June 19, 2009 and returned to Orleans Parish Prison.

The same day he was arrested on the federal warrant, Dalton called Williams to arrange for her and Knockum to dig up his stash of crack from under two garbage cans in his mother's yard. He told Williams and Knockum that they would find about $2,200 worth of crack in 11 bags. He also told Williams that his cousin Shantay was going to give Williams 14 grams of crack, three of which she should give back to Shantay and the rest of which she should give to Miller. The next day, Dalton called

Williams and asked her how everything was going.  Williams said that Shantay had received the crack she was supposed to get, and so had Miller.  In addition, she and Knockum had sold some of the crack they had dug up the night before, and Miller had told her that he would help her sell some of it.  Williams testified at trial that she did give Miller some of the crack to sell.

B.  Procedural Background

On October 30, 2009, the Government filed a superseding indictment[1] that charged Dalton, Lance, Miller, Williams, and Knockum with various crimes.  They were all charged with conspiring to possess with intent to distribute fifty or more grams of crack and a quantity of marijuana in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), 841(b)(1)(D), and 846 ("Count One").  Dalton and Miller were charged with possessing with intent to distribute five grams or more of crack in violation of 21 U.S.C.  §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C.  § 2 ("Count Two").  Dalton and Miller were also charged with possessing a firearm in furtherance of the drug trafficking crimes charged in Counts One and Two in violation of 18 U.S.C.  §§ 2, 924(c)(1)(A), and 924(c)(2) ("Count Three").  Dalton was charged with being a felon in possession of a firearm in violation of 18 U.S.C.  §§ 2, 922(g), and 924(a)(2) ("Count Four").  Miller was also charged with being a felon in possession of a firearm in violation of 18 U.S.C.  §§ 2, 922(g), and 924(a)(2) ("Count Five").  Dalton, Lance, Miller and Williams were all charged with conspiring to obstruct, influence, or impede an official proceeding in violation of 18 U.S.C. §§ 1512(c)(2) and 1512(k) ("Count Six").  Lance and Knockum were charged with using a communication facility to facilitate a conspiracy to possess with intent to distribute crack in violation of 21 U.S.C. § 843(b) ("Count Seven").  Dalton, Williams and Knockum were charged with possessing with intent to distribute fifty grams or more of crack in violation of 21 U.S.C.  §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C.  § 2 ("Count Eight").  Dalton, Williams and Knockum were also charged with using a communication facility to facilitate the conspiracy to possess with intent to distribute crack in violation of 21 U.S.C.  § 843(b) ("Count Nine").

1.  Pretrial Motions

Dalton moved to suppress the handgun and drugs seized from the truck on February 20, 2008, arguing that:  (1) the stop was pretextual because Perez and Moore never received a tip from a confidential informant, and they were following Dalton too closely for him to have committed any traffic violations; (2) the officers did not ask to search the truck upon stopping him and only called the K–9 Unit when their initial search of the truck turned up nothing; and (3) Perez and Moore confiscated $3,000 from Williams's purse when they searched her apartment, not the $1,000 they later claimed.  The district court held an evidentiary hearing on January 27, 2010, at which Perez and Moore testified.  On February 3, 2010, the district court denied

Dalton's motion to suppress, determining that (1) Perez and Moore's version of events was more credible than Dalton's; (2) probable cause existed to stop the truck based on the confidential informant's tip and Dalton's failure to abide by the traffic laws; (3) because the car was properly stopped, Dalton—as an unauthorized driver of the rental truck—lacked standing to challenge the search; and (4) even if Dalton had standing to challenge the search, the police had probable cause to search the truck because of the confidential informant's tip, Dalton's failure to abide by the traffic laws, and the strong smell of lemon air freshener.

On March 25, 2010, after the district court had denied Dalton's motion to suppress, Dalton's attorney sent a letter to the Government stating that it had just come to his attention that Moore was the subject of a formal FBI investigation into allegations that he had lied to cover up possible police misconduct arising out of the death of a man in 2005.  In April, Dalton's attorney subpoenaed documents from the NOPD's Public Integrity Bureau, seeking any complaints or investigative findings in Perez's and Moore's files.  The Government had already provided these materials to the district court to review and make available to the defense.

\*  \*  \*

2. Jury Selection

On June 1, 2010, jury selection began for the trial of Dalton, Lance and Miller.[2] ....

\*  \*  \*

3. Convictions and Sentencing

After four days of testimony, the Government rested its case.  At the close of the Government's case, the Defendants all made general motions to dismiss based on insufficiency of the evidence, which were denied.  None of the Defendants presented a case.  The jury reached a verdict later on the fourth day of the trial.  Defendants were all convicted on Count One, conspiring to possess with intent to distribute 50 or more grams of crack and a quantity of marijuana.  Dalton was convicted on Counts Two, Three, and Four, possessing with intent to distribute five grams or more of crack, possession of a firearm in furtherance of the crimes charged in Counts One and Two, and felon in possession of a firearm.  Miller was acquitted on Counts Two and Five.  Defendants were all convicted on Count Six, conspiring to obstruct an official proceeding.  Lance was convicted on Count Seven, using a telephone to facilitate the conspiracy to sell crack.  Finally, Dalton was convicted of Counts Eight and Nine, possession with intent to distribute 50 or more grams of crack and using a telephone to facilitate the possession with intent to distribute 50 or more grams of crack.

Before sentencing, Dalton filed a motion for a judgment of acquittal or new trial, arguing again that the handgun and crack should have been suppressed. Dalton cited testimony at trial that drew into question Perez's and Moore's testimony at the suppression hearing. Dalton also cited the federal indictment of Moore for his alleged involvement in the cover-up of a man's death in 2005. The district court denied Dalton's motion. The district court also denied a motion to continue Defendants' sentencings until after Sentencing Guidelines were issued pursuant to the Fair Sentencing Act of 2010 ("FSA").

Dalton was sentenced on September 15, 2010, to life imprisonment on Counts One, Two and Eight; 120 months on Count Four; 240 months on Count Six; and 96 months on Count Nine, all to be served concurrently. Dalton was also sentenced to 60 months on Count Three, to be served consecutively to the other counts. The district court determined that the FSA did not apply retroactively to Dalton's case, but that even if it did, the district court would have imposed the same sentence pursuant to the factors in 18 U.S.C. § 3553(a).

Lance was also sentenced on September 15, 2010. The district court sentenced him to life imprisonment on Count One; 240 months on Count Six; and 96 months on Count Seven, all to be served concurrently. Again, the district court determined that even if the FSA applied retroactively, Lance would have received the same sentence.

Miller was sentenced on September 29, 2010. The district court sentenced Miller to 240 months on Count One and 210 months on Count Six. All but 60 months of the term of imprisonment imposed on Count Six were to run concurrently with the sentence imposed on Count One, for a total of 300 months of imprisonment. Again, the district court noted that even if the FSA applied retroactively, his sentence would have been the same.

[1] The original indictment, filed on June 18, 2009, charged Dalton with possession and intent to distribute crack, possession of a firearm in furtherance of crack possession and distribution, and possession of a firearm by a felon.

[2] Prior to trial, Williams and Knockum entered into plea agreements with the Government and both testified for the Government at trial.

*U.S. v. Bennett*, 664 F.3d 997, 1001-08 (5th Cir. 2011).   On December 16, 2011, the Fifth Circuit affirmed the defendants' convictions and sentences.  *Id.* at 1016.   On April 2, 2012, the Supreme Court denied Dalton Bennett's petition for *certiorari*.[1]   *Bennett v. U.S.*, 132 S. Ct. 1875 (2012).

On May 13, 2013, Bennett filed a motion for extension of time in which to file a motion for post-conviction relief.  *See* Rec. Doc. 324.  The Court denied the motion without prejudice, explaining that because the motion was not accompanied by an actual motion under section 2255, the Court was without jurisdiction to consider the issue of timeliness.  Rec. Doc. 325.  On June 6, 2013, Bennett filed the instant motion for post-conviction relief, together with a motion for reconsideration on the extension of time issue.  Rec. Docs. 332, 333.   On July 30, 2013, the government filed a motion to dismiss Bennett's petition on grounds that it was not timely filed, which this Court set for submission on August 21, 2013, and denied on September 18, 2013.  Rec. Docs. 338, 345, 348.   Bennett also filed a "supplemental proffer" (Rec. Doc. 341).

On October 28, 2013, the government filed a response to Bennett's motion for post-conviction relief.  Rec. Doc. 353.   On November 19, 2013, Bennett moved for an extension of time in which to file a reply, which the Court granted.  Rec. Docs. 354, 355.  Bennett filed his reply on January 16, 2014.  Rec. Doc. 363.  The matter is now before the Court.

---

[1]  The Supreme Court vacated and remanded the judgment as to Dalton Bennett's brother, Lance Bennett, for reconsideration in light of *Dorsey v. U.S.*, 132 S. Ct. 2321 (2012).  *Bennett v. U.S.*, 133 S. Ct. 71 (2012).  On remand, the Fifth Circuit re-affirmed this Court's sentence as to Lance Bennett, noting that Dalton Bennett had not challenged his sentence under the FSA.  *U.S. v. Bennett*, 485 F. App'x 673, 674 & n.1 (5th Cir. 2012).

**II.   LAW AND ANALYSIS:**

Section 2255 of Title 28 of the United States Code provides that a federal prisoner serving a court-imposed sentence "may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).  Only a narrow set of claims is cognizable under section 2255.  The statute identifies four bases on which a motion may be based:  (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a).  A claim of error that is neither constitutional nor jurisdictional is not cognizable in a section 2255 proceeding unless the error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

After reviewing the government's answer, any transcripts and records of prior proceedings, and any supplementary materials submitted by the parties, the Court must determine whether an evidentiary hearing is required.  Rule 8, 28 U.S.C. foll. § 2255.  An evidentiary hearing must be held unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).  No evidentiary hearing is required, however, if the prisoner fails to produce any "independent indicia of the likely merit of [his] allegations." *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir.1998)).   It is the

8

petitioner who bears the burden of establishing his claims of error by a preponderance of the evidence. *Wright v. Bondurant*, 689 F.2d 1246, 1251 (5th Cir.1982).

Here, Bennett asserts five arguments in support of his motion: (1) Trial and appellate counsel were ineffective when they failed to investigate facts relating to malfeasance and dishonesty by Officers Perez and Moore; (2) "Trial and appellate counsel were ineffective when they failed to raise *Brady/Giglio* violation due to the government's uses of false testimony during Bennett's suppression hearing and trial as well as the failure to turn over any (302) or cooperation agreements of the[ir] two witnesses Shelly Knockum and Nicole Williams;" (3) "Trial and appellate counsel were ineffective by failing to object at trial and raise on direct appeal the violation of Bennett's Sixth Amendment right to face his accuser at trial by allowing officer Perez to testify in place of the alleged (CI);" (4) "Appellate counsel was ineffective for failing to challenge Bennett's detention after the traffic stop;" and (5) "Appellate counsel was ineffective for failing to raise abuse of discretion by the District Court for restricting cross-examination and evidence to the jury of government's key witness." Rec. Doc. 332 at 18-19; Rec. Doc. 341 at 5.

To establish a claim of constitutionally ineffective assistance of counsel, the petitioner must show both: (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance, the likely outcome of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–96 (1984). A petitioner must meet both prongs of the *Strickland* test. If the Court finds that the

petitioner has made an insufficient showing as to either prong, the Court may dispose of the claim without addressing the other prong.  *Id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

In assessing the first prong of the *Strickland* test, counsel's performance must be compared to "an objective standard of reasonableness, mindful of the strong presumption of adequacy." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).  A court should not find inadequate representation merely because, with the benefit of hindsight, the court disagrees with counsel's strategic choices.  *Id.*  To the contrary, the Fifth Circuit has made clear that "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Id*. (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (on rehearing)).   The Fifth Circuit applies the same standard for ineffective assistance of counsel to trial and appellate counsel.  *United States v. Merida*, 985 F.2d 198, 202 (5th Cir.1993).

As for the second Strickland prong, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  Bennett's claims fail under both prongs.

**A.      Alleged Failure to Investigate Facts Relating to Malfeasance and Dishonesty By Officers Perez and Moore:**

Bennett argues that his counsel was ineffective in failing to subpoena the state records of Officers Perez and Moore, which, he argues, would have exposed their dishonesty and malfeasance in their employment as police officers.  He argues that a proper investigation by defense counsel would have revealed:  (1) that Detective Perez had a reckless disregard for the law, both on-duty and off-duty; (2) that Detective Perez had a history of dishonesty; and (3) that Officer Moore was under investigation and later convicted for falsifying a police report and lying to the FBI about it.

It is well established that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691.  Thus, a decision by counsel "not to investigate must be directly assessed for reasonableness." *Id.*   In doing so, however, the Court must apply "a heavy measure of deference to counsel's judgments." *Id.*   Moreover, a petitioner who "alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

The record reveals that Bennett's trial counsel did in fact subpoena Perez' personnel file. After reviewing it *in camera*, this Court made parts of it available to trial counsel, and counsel used these documents to impeach Perez at the suppression hearing and at trial.  The remainder was placed under seal, made part of the record on appeal, and provided to Bennett's appellate counsel upon his motion for leave to view them.  Thus, counsel fully investigated Perez'

background.  He sought full access to Perez' employment records and obtained access to all that the Court would allow.  Likewise, with regard to Moore, trial counsel did discover prior to trial that the detective was the subject of an FBI investigation relating to reporting inconsistencies in connection with the death of Raymond Robair.  Thus, the record does not support Bennett's argument that his counsel was ineffective in this regard.  Nor has he shown a reasonable probability that the outcome of the trial or the suppression hearing would have been different if counsel proceeded differently in his use of the information.

### B.   Alleged Failure to Raise *Brady*/*Giglio* Violations:

Bennett argues that defense counsel was ineffective in failing to raise *Brady* and *Giglio* violations relating to use of Perez' and Moore's testimony at the suppression hearing and trial and Perez' testimony at trial.   He also argues that the government failed to turn over 302s, the "proffer session," and "the deal" made with Bennett's girlfriend (Nicole Williams) and his brother's girlfriend (Shelley Knockum).

With regard to Perez, Williams, and Knockham, Bennett fails to point to any *Brady*/*Giglio* material that was not disclosed.   Perez' entire personnel file was produced to the Court, with material parts disclosed to defense counsel after *in camera* review.   The government's plea agreements with Williams and Knockum were likewise disclosed.  Both witnesses were questioned at length at trial about their agreements and the benefits of cooperating with the government.  As there was no basis for a *Brady*/*Giglio* objection, Bennett's counsel was not ineffective for failing to raise one.

With regard to Moore, the Fifth Circuit has already addressed the issue of *Brady* materials relating to the FBI investigation and found that knowledge of the investigation likely would not have changed the outcome of the trial:

> Moore's subsequent indictment for lying to the FBI is not "material" because its disclosure would probably not have changed the result of Dalton's trial. First, at the time of Dalton's suppression hearing, Moore had not yet even made the false statement to the FBI for which he was later indicted. It is therefore unclear how Dalton could have used false statements that had not yet occurred to impeach Moore at the suppression hearing. Further, Perez corroborated Moore's testimony at the suppression hearing, and therefore it is likely that the district court would still have denied Dalton's motion to suppress. Moreover, because Moore did not testify at trial and likely would have exercised his right to avoid self-incrimination had he had been called to testify, the outcome of the trial would probably not have been different had Dalton and the other Defendants known that the FBI was currently investigating Moore for filing false police reports. Thus, the district court did not err in denying Dalton's motion for acquittal or a new trial.

*Bennett*, 664 F.3d at 1012.   Thus, even if undisclosed *Brady*/*Giglio* materials had existed at the time of trial, Bennett suffered no prejudice as a result of counsel's failure object on this basis.

### C.   Alleged Failure to Object under the Confrontation Clause:

Bennett argues that defense counsel was ineffective in failing to raise a Confrontation Clause objection to the introduction of a confidential informant's statements via the testimony of Detective Perez.  He argues that this deprived him of the right to cross-examine the CI.

The Confrontation Clause of the Sixth Amendment "bars the introduction of 'testimonial statements' of a witness who does not appear at trial 'unless he [is] unavailable to testify, and the defendant had [ ] a prior opportunity for cross examination.' " *Dorsey v. Stephens,* 720 F.3d 309, 317 (5th Cir. 2013) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)).   "This rule, however, applies only to statements offered to prove the truth of the matter asserted." *Id.*; *see*

13

*also Williams v. Illinois*, —— U.S. ——, 132 S.Ct. 2221, 2228 (2012) ("[I]t is settled that the Confrontation Clause does not bar the admission of [nonhearsay] statements."); *Crawford*, 541 U.S. at 59 n. 9 ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *U.S. v. Polidore*, 690 F.3d 705, 719 n. 15 (5th Cir. 2012) ("[T]o constitute a Confrontation Clause violation, the statement must be used as hearsay—in other words, it must be offered for the truth of the matter asserted.") (quoting *U.S. v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009)) (internal quotation marks omitted)).

Here, the statements of the CI were not offered to prove the truth of the CI's tip, but rather to explain the officers' actions, including their surveillance of Bennett's mother's house and the traffic stop.  Thus, any objection based on the Confrontation Clause almost certainly would have failed, and counsel was not ineffective for not raising it.

D.      **Alleged Failure to Object to Bennett's Detention Following Traffic Stop:**

Bennett argues that defense counsel was ineffective in failing to argue that Bennett's detention during the search of the vehicle was excessively long, thus rendering the drugs and gun found in the search inadmissible.   He argues that his Fourth Amendment rights were violated when the stop and search extended beyond the scope of the initial stop.

"Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts."  *U.S. v. Gonzalez,* 328 F.3d 755, 758 (5th Cir. 2003). Here, the record shows that the continued detention was justified by reasonable suspicion based on specific articulable facts observed by the officers.   Specifically, Bennett failed to stop immediately after Perez activated the patrol car's lights, instead driving additional

14

blocks during which the officers observed Bennett and Miller moving around within the truck. Rec. Doc. 256 at 17-18, 56; Rec. Doc. 282 at 409-10, 452-54; Rec. Doc. 73 at 2-3.  Perez also detected a strong odor of air freshener, which is known to be used by drug traffickers to cover the odor of drugs.  Rec. Doc. 282 at 410-11, 454.   In light of the CI tip, particularly given that Perez and Moore knew from previous investigations that Dalton had prior arrests for narcotics and guns, these articulated elements of reasonable suspicion constituted a more than sufficient basis to detain Bennett.  Thus, his counsel was not ineffective in failing to object on that basis.

     **E.**    **Alleged Failure to Argue on Appeal that District Court Abused its Discretion in Restricting Cross-Examination of and Evidence Relating to Witness Perez:**

Bennett argues that appellate counsel was ineffective in failing to argue that the trial court abused its discretion in limiting cross-examination and the admission of character evidence relating to prior public integrity investigations of Detective Perez.   Specifically, Bennett argues that his appellate counsel should have challenged this Court's evidentiary ruling restricting cross-examination of Perez to the one incident of dishonesty wherein the charges against him were upheld.

"The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal."  *Ellis v. Lynaugh*, 873 F. 2d 830, 840 (5th Cir. 1989).   The "abuse of discretion" standard of review makes evidentiary rulings extremely difficult to challenge on appeal.  Given this unlikelihood for success, it was not unreasonable for counsel to forego this challenge and concentrate on stronger arguments. *Id.* ("it appears that appellate counsel chose to concentrate on the six strongest points of error on appeal; that is a reasonable tactic.").

**F.       Certificate of Appealability:**

Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A court may issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); Rules Governing Section 2255 Proceedings, Rule 11(a) (noting that § 2253(c)(2) supplies the controlling standard).   A certificate of appealability should issue only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different matter or that the issues presented [are] 'adequate to deserve encouragement to proceed further.' "  *Miller–El v. Cockrell*, 537 U.S. 322, 336  (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The Court finds that Bennett's motion does not satisfy this standard.  Accordingly;

**IT IS ORDERED** that Dalton Bennett's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (**Rec. Doc. 332,** as supplemented by 341) is hereby **DENIED**.  The Court will not issue a certificate of appealability.

New Orleans, Louisiana, this 5th day of August, 2014.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**

16